## Case No. 18,087.

### WRIGHT et al. v. NORWICH & N. Y. TRANSP. CO.

#### [8 Blatchf. 14.] [1]

Circuit Court, D. Connecticut. Sept. 20, 1870. [2]

COLLISION — LIMITATION OF LIABILITY OF VESSEL OWNER.

1. Where a lookout, whose duty it is to report a vessel which he sees, does not report her when he sees her, that fact leads to the belief that he was not performing his duty as a lookout in any respect.

2. The 3d section of the act of March 3, 1851 (9 Stat. 635), entitled, "An act to limit the liability of ship-owners and for other purposes," by which such liability is, in certain cases, limited to the amount or value of their interest in the ship and her freight then pending, does not limit or affect the liability of the owner of a vessel for loss, damage, or injury resulting, through the fault of such vessel, to another vessel and her cargo, from a collision between the two vessels.

3. Whether this court, as a court of admiralty, has power or jurisdiction adequate to give full effect to the limitation of liability provided by that act, quere.

[Appeal from the district court of the United States for the district of Connecticut.

[This was a libel by William A. Wright and others against the Norwich & New York Transportation Company to recover for damages resulting from a collision. From a decree of the district court in favor of the libellants (Case No. 18,086), the present appeal was taken.]

Richard H. Huntley and Charles R. Ingersoll, for libellants.

Edward H. Owen, John S. Beach, and Jeremiah Halsey, for respondents.

WOODRUFF, Circuit Judge. This suit is brought in personam against the respondents as owners of the steamboat, the City of Norwich, to recover for a loss caused by a collision between that steamboat and the schooner General S. Van Vliet, in Long Island Sound, shortly before four o'clock in the morning of the 18th of April, 1866. The injury to both vessels was such that the schooner soon sank, with all her cargo. The

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [Affirming Case No. 18,086. Decree of circuit court affirmed by supreme court in 13 Wall. (80 U. S.) 104.]

steamboat took fire and also sank, with her cargo. Since this action was commenced, the steamboat has been raised. Some of the libellants were owners of the schooner, and the others were owners of her cargo; and they charge that the collision was caused by the negligence of those in the management of the steamboat. The respondents, on the other hand, deny all fault on their part, and allege that the schooner was in fault in not exhibiting at the time sufficient lights, as required by the act of congress. They further state, in their answer, that the steamboat had on board a large and valuable "freight" belonging to various parties, much larger in value than the whole amount of the interest of the respondents in the said steamboat and in her freight then pending, all of which "freight" was lost.

On the trial in the district court, an interlocutory decree was made, charging responsibility for the loss upon the respondents, and ordering a recovery by the libellants, with the usual reference to compute, upon which the amount of the loss by the owners of the schooner and the owners of her cargo respectively was ascertained and reported. Thereupon, by agreement of the parties, and as a part of the record of said cause prior to the final decree, a motion was filed and allowed or entertained by the court, wherein the respondents reiterated their statement that the City of Norwich, at the time of said collision, had on board a large and valuable cargo of merchandize, on freight, belonging to various parties, and much larger in amount than the whole amount of the value of the interest of the respondents in said steamer and her freight then pending, and alleged that the damages sustained by all of said parties by said collision, including the libellants, were much greater in amount than the value of the interest of the respondents in said steamer and her freight then pending, and, also, that proceedings had been commenced in behalf of said parties, against the said steamer, in the district court of the United States for the Eastern district of New York, for the recovery of said damages. The respondents thereupon prayed, that they might be permitted to show, by proper evidence, the whole amount of damages sustained by all of said parties, and the value of said steamer and her freight then pending, and that the decree of this court be so framed as to give to the libellants such part or proportion of the amount of damages sustained by them, as the said value of the said interest of the said respondents should bear to the whole amount of damages sustained by all parties by said collision. The district court denied the motion, and gave a final decree for the libellants, that they recover from the respondents the whole amount of the damages sustained, as fixed by the court, and their costs, without any regard to the value of the respondents' interest in the

steamer and her freight, or to the amount of loss sustained by other parties by the collision. [Case No. 18,086.]

Two questions, therefore, are raised and discussed upon the appeal, the case having been heard in this court upon the same proof, and on the record as it existed in the district court: (1) Upon the proof, was the collision caused by the negligence or fault of those in the management of the City of Norwich? (2) Should the respondents have been permitted to show the whole amount of loss caused by the collision to all parties affected thereby, and the value of the interest of the respondents in the vessel found in fault and in her freight then pending, with a view to reduce the recovery of the libellants to an amount duly proportioned to such value?

Upon the question first mentioned, the testimony is very voluminous, and the discussion has been very able, and the claims of the parties respectively have been sustained by a most minute and careful analysis, comparison and criticism of the testimony, and with an ingenuity, skill and force which I have rarely seen equalled. In the testimony of the various witnesses examined on behalf of the respective parties there is very much in support of either view of the question. But, after a most painstaking study of the proof, aided by the oral argument and by the elaborate, written and printed, briefs of the counsel, I am constrained to say that the preponderance of the evidence is with the libellants upon this question. In a case of great doubt, if I were inclined to a conclusion, upon a mere question of fact, at variance with the court below, I should hesitate in reversing, where the witnesses were examined in the presence of the court. Here, however, while it must be conceded that the proof on both sides presents a serious conflict, the final conclusion, from which I cannot escape, is in concurrence with that of the district judge. I have examined the testimony in the light of the searching criticism of each witness contained in the brief of the respondents' counsel, and yet I conclude that the schooner was without fault. Those in charge of the steamer were not in the exercise of due diligence. The discussion of the evidence has been so full on both sides, that I should do nothing serviceable to either party were I to reproduce the evidence tending to the result stated. The opinion of the learned district judge presents a just and impartial review of the evidence, and, in my opinion, it gives the true solution of the question in dispute. The schooner had her proper lights. It is not possible that the lookout on the City of Norwich was in the actual exercise of diligence, or he would have sooner discovered her. Indeed, when he did see her he did not report her. This neglect of duty he seeks to excuse by his belief that the pilot had himself then discovered her. It was his duty to report,

and not to trust to his supposition or surmise; and this circumstance tends very strongly, in my mind, to the belief, founded on his own testimony, that he was not performing his duty in any respect. While on the other hand, as forcibly shown in the opinion, if the actual state of the weather just before the collision rendered it impossible to see the schooner, the steamer was in like fault in not proceeding at a speed so moderate that, when she did discover the schooner, she could better control her own motions.

Upon the second question I find no little embarrassment. The claim of the respondents arises under the third section of the act of March 3, 1851 (9 Stat. 635), which reads as follows: "The liability of the owner or owners of any ship or vessel, for any embezzlement, loss or destruction by the master, officers, mariners, passengers, or any other person or persons, of any property, goods or merchandise shipped or put on board of such ship or vessel, or for any loss, damage or injury by collision, or for any act, matter or thing, loss, damage or forfeiture, done, occasioned or incurred without the privity or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner or owners respectively, in such ship or vessel and her freight then pending."

1. The manner in which the question was raised below seems to me novel. Assuming, for the moment, that the statute applies to the case, and that the respondents have, by virtue thereof, a right to reduce the libellants' recovery by proving that the whole loss by the collision exceeds the amount or value of their interest in the ship or vessel found in fault and in her freight then pending, and that the proof in reduction of damages may be given in the action brought to charge the owners, it would seem to follow that such proof should be given on the trial, or that, if the court sees fit to try the question of liability and settle the rule or measure thereof in the first instance, such proof should be offered before the commissioner to whom it is referred to take proofs of the amount of the damages for which a recovery is to be awarded. The motion made in the district court seems, however, to have been in the nature of an application to open the proofs in the cause after they were closed, and to let in testimony which, if of any avail, must have operated to modify the interlocutory decree already pronounced, which awarded to the libellants a recovery of all the damages by them sustained; and, if the motion contemplated a further hearing before the commissioner, a modification of such interlocutory decree would have been necessary. In this view, the motion was plainly addressed to the discretion of the court, and its denial, as an exercise of discretion, cannot be claimed to have been erroneous. Again, if proofs on the subject were offered in the district court and rejected. (on whatever ground and in whatever stage

of the trial or proceedings,) inasmuch as they would go not merely to a question of amount or a matter of computation, but to a rule governing the recovery when and after all the material amounts were computed and ascertained, I perceive no reason why such proofs might not be offered in the circuit court on the appeal, which has, if the appellant sees fit, many of the characteristics of a new trial. Doubtless, the issue must be made below, and the question of law should appear to have been in some form before the court below; but if, in the circuit court it appears that the testimony ought not to have been rejected, the respondents would and must be permitted to give the proof in this court. The construction of the act of congress is, however, in a degree, unsettled. The practice under it, in cases to which it applies, appears not to have been prescribed, nor is it established by any usage of the court. It can hardly be deemed a fault if counsel, under such circumstances, failed to select the most orderly mode of raising the question. Besides, I think the record shows that the course pursued had the sanction of the district court, and, although the granting of the motion would have required a modification of the interlocutory decree, and probably a further reference to take proofs of amounts, the court, no doubt, had power first to settle the question of liability, next the amount of the libellants' loss, and then, if any other fact necessary to fix the amount of recovery was wanting, to make a further reference. The precise order of proceeding in this respect which that court saw fit to pursue, would not be interfered with on an appeal, which would raise the whole question and all the questions which were raised and passed upon in the district court. Nor was the question disposed of there as a question of practice or a matter of discretion. The agreement of counsel, the allowance of the motion there, and the opinion of the court, show that it was intended as a disposition of the subject on other grounds, and it was so disposed of. And finally, on this point, I have no doubt of the power of this court on appeal, in view of the fact that the question was distinctly raised below, to entertain it here, and to deal with it as freely, according to what may be found due to the rights of the respondents, as it could if the testimony had been offered on the trial in the first instance, and been there rejected. True, on the appeal the proofs were not formally offered, but the question of their admissibility, and their influence upon the recovery, were argued at great length, and the right of the respondents to give such proof and take the benefit thereof was most earnestly insisted upon. If, therefore, such proofs were proper, and would avail to reduce the liability of the respondents in this suit, the court can give relief and ought to do so. I must, therefore, treat the question as open, and as fully as it was considered in the district court.

2. It is very strongly argued, that the act of congress has no application to the claim of the owners of another vessel, or of the cargo of another vessel, injured by a collision with a ship which is in fault in producing it; that the claim of the libellants in this case is not within the statute; and that, therefore, the proofs proposed to be given, and the facts they would establish, are irrelevant, and cannot affect the amount of the recovery.

The special circumstances which led to an effort by ship-owners to procure an act of congress in modification of their common law liability, which resulted in the passage of the act in question, are of some significance. They were, to some extent, within my own personal knowledge. They were very notorious, and are referred to in the debates in the senate of the United States on the passage of the bill. Shortly before the subject was brought to the attention of congress, the packet ship Henry Clay, a large, costly and nearly new ship, lying at the wharf in the port of New York, having nearly completed her lading and being bound for Europe, took fire from some cause and was burned, with a cargo already laden amounting in value, according to my recollection, to half a million of dollars. Her owners, being losers to a very large amount by the burning of the ship, were proceeded against by owners of cargo, to compel payment to them of its value. In one of the actions I was myself of counsel, and it was strenuously insisted, that even without any such statutes as exist in England, the owners could not be charged upon the usual rule of the liability of common carriers at common law. No proof of actual fault or negligence, except so far as the occurrence of the fire in the ship might warrant such inference, was given or attempted. The owners were held liable. Pending that action I was aware, through the distinguished counsel for the then defendants, that an effort was being made to procure some legislation from congress to soften the rigor of the rule declared in that case.

Some years before the burning of the Henry Clay, and on the night of the 13th of January, 1840, the steamboat Lexington was burned upon Long Island Sound, and the disaster was accompanied by a painful loss of life and the destruction of a large amount of property. Litigation ensued, and the liability of the owners was declared in the case of New Jersey Steam Nav. Co. v. Merchants' Bank, in the supreme court of the United States (6 How. [47 U. S.] 344), decided in 1848.

Both of these disasters, and the alleged hardships of the law against ship-owners as common carriers, were commented upon in the debates which were had upon the act now in question. An examination of those debates shows, that it was the stringent rule of the common law which made common carriers of property liable for all losses, (except such as were caused by the act of God or the public enemy), however free from

actual fault or negligence, that was the subject of comment; and the apparent purpose, so far as it may be gathered from those debates, was to relax that rule. It is, therefore, a further significant circumstance, that, in those debates, nothing was said of injuries to other vessels, or the liability of ship-owners, as principals, for the tortious negligence of their ship-masters, officers or crews, as their servants, by which the property of persons in no wise entrusted to them receives injury. Nor was the rule of the common law which makes the master liable for the negligence of his servant in his business, the subject of review, criticism or comment. These circumstances, by no means controlling, are, nevertheless, appropriately referred to in reviewing the act, and may throw light upon its meaning, if otherwise such meaning and the intent of the legislature be doubtful.

The act itself begins with a declaration, that a ship-owner shall not be liable for loss or damage by fire to any goods or merchandise whatever, shipped, taken in, or put on board, unless such fire is caused by the design or neglect of the owner. This has no other operation than to affect his relations as a common carrier. The proviso to that section, that "nothing in this act shall prevent the parties from making such contract as they please, extending or limiting the liability of ship-owners," is some indication that congress believed that they were dealing with a question of liability which might be the subject of a contract, not with a liability for tortious negligence to parties who stood, and who could stand, in no relation of contract whatever with such owners. The proviso is annexed apparently to the first section, but it is noticeable that the language is not, "nothing in this section," but "nothing in this act," indicating that the proviso was intended to apply to the whole act. The proviso was introduced as an amendment after the act was reported to the senate, and the inference that a relation which might appropriately be the subject of a prior contract was the subject of the entire act, is by no means unwarranted.

The second section appertains solely to the duty of shippers to the master and owners of the ship, in the relation of the latter to the former as carriers, and the liability affected thereby is expressly described as their liability "as carriers thereof."

The third section is in the terms already above recited. It must be conceded that it contains terms which, viewed apart from the residue of the act, are broad enough to include injury to other vessels by collision. This fact is not conclusive. In the construction of statutes as well as private instruments and contracts, general words are restricted in their meaning by the subject-matter of the statute or instrument, the context, and the apparent intent; and, in an enumeration of particulars followed by general terms, a restriction of the latter to cases or things ejusdem generis is according to settled rule. Moore v. American Transp. Co., 24 How. [65 U. S.] 1, 36; Reg. v. Reed, 28 Eng. Law & Eq. 133; Reg. v. Nevill, 8 Q. B. 452; Sandiman v. Breach, 7 Barn. & C. 96; Ryegate v. Wardsboro, 30 Vt. 746; Simonds v. Powers, 28 Vt. 354.

In construing any particular clause or words of a statute, it is especially necessary to examine and consider the whole statute, and gather, if possible, from the whole the intention of the legislature. Now, it has already been seen, that the first and second sections have sole reference to the relations of ship-owners as common carriers. The fourth section as clearly affects them in that relation only. Thus, it provides, "that if any such embezzlement, loss, or destruction, shall be suffered by several freighters or owners of goods, wares, or merchandize, or any property whatever, on the same voyage, and the whole value of the ship or vessel, and her freight for the voyage, shall not be sufficient to make compensation to each of them, they shall receive compensation * * * in proportion to their respective losses; and for that purpose the said freighters and owners of the property, and the ship-owners, or any of them, may take the appropriate proceedings in any court, for apportioning the sum to which the ship-owners are liable; * * * and the ship-owners are authorized to transfer their interest in the vessel or freight, for the benefit of such claimants, to a trustee, to be appointed, &c., * * * from and after which transfer, all claims and proceedings against the owner or owners shall cease." Here, the terms, "goods, wares or merchandize or any property whatever," are equivalent to the words in the third section, "any property, goods or merchandize," and to the words, "goods, wares, merchandize or other property," in the sixth section, in each of which they relate solely to property of some kind put on board of the vessel. The phrase is added, "on the same voyage," to confine the participation in the apportionment to the freighters for a single voyage, and not to permit the ship-owners to bring into the compensation losses sustained on prior or other voyages. This limitation of the application of the fourth section is very important in its bearing upon the question in another aspect, but here I state it simply in order to show that such is its proper construction. It may be possible to select a portion of the words to give color to a more comprehensive meaning; but "freighters or owners of goods, wares or merchandize, or any property whatever, on the same voyage," could not include the owner of another ship pursuing a voyage in another direction, sunk by collision. And a loss suffered by several freighters or owners of property on the same voyage, is wholly inapt to include the loss sustained by the owner of another ship on another voyage. This limitation of the application of the

fourth section to property on board of the ship, or for which the ship-owners would, by the common law, be liable as common carriers, has been affirmed by Mr. Justice Grier in Barnes v. Steamship Co. [Case No. 1,021], and by the decision of Judge Merrick in Walker v. Boston Ins. Co., 14 Gray, 288, in Massachusetts.

The fifth section places charterers in the same situation as ship-owners, when the former man, victual and navigate the ships.

The sixth excludes the idea that the act was intended to exonerate the master, officers and mariners from liability for their own fraud or negligence.

The seventh relates solely to persons shipping dangerous or inflammable articles on board of a vessel taking a cargo for various persons on freight, without giving a notice describing their nature and character, and imposes a penalty; and the last section exempts certain craft from the operation of the act.

A perusal of the entire act, and a consideration of its apparent design, its general purport being applicable to ship-owners as common carriers only, compels me to conclude that it was only their relation as such carriers which congress had in view. If it is asked, what, then, do the words, "for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred," mean? I answer, that, having the responsibility of a carrier at the common law in view, a responsibility which subjected the ship-owner to liability for every loss not caused by the act of God or the public enemy, some such words were necessary to cover all the grounds of his liability as a carrier. It was not enough to specify "embezzlement, loss, or destruction by the master, officers, mariners, passengers or any other person or persons." Collision and many other acts and things might occasion loss or injury to property entrusted to the ship-owner as a carrier, for which but for these words he would be responsible to the full amount. The collision in the case now under consideration furnishes an illustration, for, the City of Norwich having on board a very valuable cargo, that cargo was lost by the collision, and that loss would be within the terms of the section. Not only so, collision and many other acts, matters, things, losses, damage and injury might happen, and be "done, occasioned or incurred" without any fault or negligence either of the ship-owners or of their masters or mariners, and be due solely to the fault or negligence of other persons, or be an accident in such sense that faulty negligence could be imputed to no one, and yet the ship-owners would be liable. These classes of cases are, therefore, provided for, and are clearly within the design and object of the statute. There is, therefore, a large field for the operation of all the words of the third section, without

30 Fed.Cas.—44

extending their meaning to an injury to another vessel or goods on board thereof.

There is, also, great force in the argument of the counsel for the libellants, founded upon the provisions of the English statute in relation to ship-owners. The statute of 53 Geo. III. c. 159, was before the congress of the United States when this act was passed. It not only so appears by the debates, but it would reasonably be so inferred. The discussion proceeded largely upon the policy of England and of this country, in their relations to other maritime nations, of encouraging the building and employment of ships, by relaxing the severe rule of the liability of carriers at the common law. The English statute in terms extended beyond that, and applied the limitation of responsibility, in very terms, to any loss or damage, which "may happen to any other ship or vessel or to any goods, wares, merchandize or other things being in or on board of any other ship or vessel;" and congress rejected this sentence altogether, and employed general expressions, almost identical with the previous English statute, which related solely to the liability of ship-owners as carriers. It is inconceivable that if this liability for injury to another ship or vessel, or to goods on board of another vessel, was intended to be embraced in the act, those clear and explicit terms employed in the English act should have been discarded. The rejection of those words cannot be otherwise accounted for, except it be upon a supposition dishonorable to the framers of the law, and which the court cannot for a moment indulge, namely, that there was a covert design to employ words which might have a similar operation, and their meaning be so concealed that the bill might be passed by congress in ignorance of the design. The words, "loss, damage or injury by collision," and the general words that follow, have, therefore, by just construction, the same meaning and effect as they would if the word "thereto" had been used in connection therewith. namely, "for any loss, damage or injury thereto by collision," &c.

Again, if I am right, or if Mr. Justice Grier and the supreme court of Massachusetts are right, in holding that the fourth section of the act applies only to freighters and owners of goods and property on board of the ship, and, therefore, applies only to the relation of the ship-owners to those whose goods and property they assume to carry, it seems to me inevitable that the whole act, the third section included, applies only to the same relation, and for this reason: Congress was in the act of limiting the responsibility of ship-owners, and, by the third section, had declared that limitation for all the cases to which it should apply. They fixed its extent, namely, "the amount or value of the interest of such owner or owners respectively in such ship or vessel and her freight then pending." To provide for carrying this limi-

tation into effect, and to make it operate equitably among all parties suffering losses within the act, they declare, first, that each shall receive in proportion to his loss, and that proceedings for apportioning the amount may be taken by either party. It is not possible that it was intended to include in the limitation of the amount to be recovered, owners of another vessel injured by a collision, and yet exclude them from the benefit of the apportionment provided in the fourth section. Again, the fourth section provides, that the ship-owners may transfer their interest in the ship and freight to a trustee, and that, after such transfer, all claims and proceedings against such owners shall cease. How, then, shall the limitation be made to operate in their favor as against the owners of another ship, (if they are included in the third section), when such owners are not to become beneficiaries under the trust created pursuant to the fourth section? A construction which makes the third section apply to an injury done to another vessel, or the goods on board of another vessel, by a collision, cannot stand with the fourth section so construed, or with any view of justice or equity, or in any consistency with the principle of the act itself, namely, the limitation of the ship-owner's liability to the amount of his interest.

I have not been unmindful that dicta are found in some cases cited by counsel, which assume that the statute in question does include a case of injury to another vessel by a collision therewith. But in none was that the point in judgment, or, if incidentally involved, was the question raised or discussed. Those dicta are chiefly in the words of the statute itself, and in truth furnish no aid to its true construction, nor do they decide the question I have considered.

Without protracting the discussion, already too prolix, I am constrained to say, that the act of congress relied upon by the counsel for the respondents has no application to the injury received by the libellants in this case, and, therefore, that the proofs proposed to be given were wholly irrelevant, and could have no influence upon the decree which it was the duty of the district court to make.

3. The conclusion which I have reached leads to an affirmance of the decree, though upon different grounds from those which led the district court to reject the evidence offered. It is, therefore, not necessary that I should express an opinion upon the question whether this court, as a court of admiralty, has powers or jurisdiction adequate to give full effect to the act of congress referred to.

If congress had declared that the respondents should not be liable for losses sustained by the collision except to the amount of their interest in the vessel in fault and her freight then pending, no court, whether of admiralty or law or equity, could properly make a decree which in terms would sub-ject them to a larger liability and thereby practically nullify the statute. Under the similar English statute, even the courts of law have regarded this limitation as prescribing the rule or measure of damages in actions on the case when the liability to a single plaintiff was before the court, though no such case is cited where losses were sustained by other parties which were sought to be brought into the computation. Cannan v. Meaburn, 1 Bing. 465; Wilson v. Dickson, 2 Barn. & Ald. 2; Brown v. Wilkinson, 15 Mees. & W. 391. It cannot be doubted that, in a case to which the statute applies, if several libels are filed in the court of admiralty by different claimants for losses sustained, or one bill is filed on behalf of several such claimants, that court has ample power to give full effect to the statute as against such libellants, so far at least as to refuse a decree which shall subject the respondents to a larger liability to all those libellants than the act of congress declares. The Richmond, 3 Hagg. Adm. 431; The Benares, 1 Eng. Law & Eq. 637; The Dundee, 1 Hagg. Adm. 109; Gale v. Laurie, 5 Barn. & C. 156. In England, in Dobree v. Schroder, 2 Mylne & C. 489, and 6 Sim. 291, after two separate actions at law had been separately prosecuted to verdicts, the court of chancery entertained a bill for the apportionment of the value of the vessel, &c., between the two plaintiffs and the limitation of the owners' responsibility to that value.

A resort to a court of equity may be necessary under this act of congress, to make such an apportionment, if the party seeking it desires to bring into view losses sustained by all; and yet a libellant in admiralty would have no ground of complaint, if, having chosen to go into that court, the respondent were permitted to prove any facts, which as matter of law, operated to reduce the amount of the recovery. As between him and the respondent, such proof might furnish a measure of the amount to which he was entitled, and an assessment made in conformity therewith might be conclusive between the parties, although no third person would be affected thereby. If, in this view, the statute could be held to warrant the application of the statute in each case and between any parties, it might not concern a particular libellant to have other parties before the court, provided he were himself willing to take the hazard of such proofs as the respondent might give of the aggregate amount of the losses, and the same might be true of the respondent, if he should prefer to try the question as to each claimant.

It must, of course, be conceded, that, whatever rights a party may have, and whether given by statute or otherwise, they are to be asserted in due and proper form and before the proper tribunal. But it cannot, I think, be true, that a defendant must be made to bear a liability to which a valid statute declares he shall not be subject, up-

on any idea that there is no court which can administer the statute. It were better to say—if there is no court which can give a judgment or decree in favor· of the claimant without violating the statute, then no decree or judgment can be rendered. And, if it were clear, by reason of the number of claimants who have sustained losses and their residence in various states, that there is no tribunal which can obtain jurisdiction of all, it would be plausible, at least, to say, that the court is compelled to proceed with the parties of whom they have jurisdiction, and render justice as between them, upon all the proofs either may offer bearing on the liability according to the limitation which the statute has declared.

The decree must be affirmed.

[The decree of the circuit court was affirmed by the supreme court, 13 Wall. (80 U. S.) 104. For other cases growing out of the same collision, and involving some of the same questions, see Cases Nos. 11,202 and 2,760–2,762.]